UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID CARR,

      Plaintiff,

v.                                                                    CASE NO. 8:14-cv-2867-T-23AEP

JOHN HANCOCK LIFE INSURANCE
COMPANY (USA),

      Defendant.

_____/

## ORDER

Under the Employee Retirement Income Security Act of 1974 (ERISA), David Carr sues (Doc. 5) John Hancock Life Insurance Company for wrongfully denying a claim for long-term disability benefits. John Hancock Life moves (Doc. 30) for summary judgment.

## BACKGROUND

### 1. The Plan and the Policy

Carr worked for Shell Oil Company and participates in Shell's pension and welfare-benefits plan, which is governed by ERISA. Under Shell's plan, John Hancock Life issued to Shell a policy of "Group Long-Term Care Insurance," and Carr is insured under the policy. (Doc. 30 at 2) If an insured is eligible for benefits, the policy requires John Hancock Life to pay the cost of the insured's long-term care.

Under the policy's "benefit trigger" (Doc. 30-5 at 9), an insured can become eligible for benefits in two ways.  First, an insured becomes eligible if the insured requires "substantial supervision" to protect the insured "from threats to health and safety" resulting from a "severe cognitive impairment."[1]  (Doc. 30-5 at 9)  The policy defines "severe cognitive impairment" as a "loss or deterioration in intellectual capacity" that is "comparable to . . . Alzheimer's disease and similar forms of irreversible dementia" and that is "measured by clinical evidence and standardized tests."  (Doc. 30-5 at 14)

Second, the insured becomes eligible for benefits if, "due to a loss of functional capacity," the insured cannot "without substantial assistance from another individual" perform at least two "activities of daily living for a period of at least [ninety] days."[2]  (Doc. 30-5 at 9)  The policy lists six activities of daily living:

> Bathing means washing oneself in either a tub or shower, including the task of getting into or out of the tub or shower.
>
> Continence means the ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).
>
> Dressing means putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

---

[1] This order describes the policy's first method for establishing eligibility as the "cognitive-impairment provision."

[2] This order describes the policy's second method for establishing eligibility as the "functional-disability provision."

- 2 -

> Eating means feeding oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

> Toileting means getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

> Transferring means moving into or out of a bed, chair or wheelchair, or moving from place to place either via walking or wheelchair or other means.

(Doc. 30-5 at 8)  Notably, the policy fails to list "housework" or "housekeeping" as an activity of daily living.  (Doc. 30-5 at 8)

"Substantial assistance" means either "hands-on assistance" or "standby assistance" by "another person needed to perform" the activity of daily living.  (Doc. 30-5 at 14)  The policy defines "hands-on assistance" and "standby assistance":

> *Hands-on assistance* means the physical assistance of another person without which You would be unable to perform the Activity of Daily Living. You will be considered unable to perform an Activity of Daily Living if You are not able to participate in that activity or You are able to contribute in only a minor way.

> *Standby assistance* means the presence of another person within arm's reach of You that is necessary to prevent, by physical intervention, injury to You while You are performing the Activity of Daily Living.

(Doc. 30-5 at 14)

An insured must submit a written "proof of claim" that is "satisfactory" to John Hancock Life and that "confirms" that the insured "continue[s] to meet all eligibility requirements."  (Doc. 30-5 at 19)

Case 8:14-cv-02867-SDM-AEP   Document 73   Filed 10/17/16   Page 4 of 12 PageID 3424

**2. Claim Approval**

In May 2011, Carr submitted to John Hancock Life a claim under the policy. (Doc. 36 at 7)  Carr was diagnosed with anemia, anxiety, depression, hypertension, legal blindness, and prostate cancer.[3]  (Doc. 36 at 7)  After reviewing Carr's medical records, John Hancock Life determined that Carr was eligible for benefits because Carr needed assistance with bathing, dressing, eating, toileting, and transferring.  As a result, John Hancock Life approved Carr's claim.  (Doc. 30 at 5)

In February 2012, Carr submitted to John Hancock Life a claim seeking payment for the cost of a home healthcare service.  To determine whether Carr remained eligible under the policy, John Hancock Life ordered an "independent external care assessment" in which third-party Univita Healthcare Solutions, LLC, evaluated Carr's cognitive health and functional ability.  (Doc. 34-2 at 1–3; Doc. 69-1 at 1–30)  During the assessment, Carr was intoxicated and debilitated; Carr explained to the Univita nurse that he "had been drinking for [three] weeks and had not bathed in [three] weeks."  (Doc. 69-1 at 1)  The evaluation of Carr's functional ability concluded that Carr needed hands-on assistance with bathing, dressing, and bladder continence care, and standby assistance with transferring, toileting, and bowel continence care.  (Doc. 69-1 at 1)  Accordingly, John Hancock Life approved Carr's claim.

---

[3] A 2011 psychological evaluation, which notes that Carr was "diagnosed in the past" with Lewy body dementia, was included in the records submitted to John Hancock Life.  (Doc. 69-1 at 98)

- 4 -

Beginning in April 2012, a nurse employed by Maxim Health Care Agency assisted Carr with his daily activity, and John Hancock Life paid for the service. According to "weekly notes"[4] completed by Maxim between April 2012 and February 2013, the nurse typically assisted Carr with housekeeping and two activities of daily living — bathing and transferring.  (*See* Doc. 35-2 at 185, 212, 235)  In February 2013, John Hancock ordered another assessment by Univita.  (Doc. 34-2 at 8; Doc. 69-1 at 34–59)  The cognitive screening of Carr revealed no evidence of a cognitive impairment.  (Doc 69-1 at 38–41)  However, the evaluation of Carr's functional ability showed that Carr needed hands-on assistance with bowel-continence care and standby assistance with bathing, toileting, and transferring.[5]  (Doc. 69-1 at 45–50)  John Hancock Life again approved Carr's claim.

After the February 2013 assessment, Carr's functional ability improved. According to weekly notes from May to mid-June 2013, the Maxim nurse typically assisted Carr with only housekeeping and bathing.  (*See* Doc. 35-2 at 264, 267, 275) According to "independent care provider bills"[6] from mid-June to mid-August 2013,

---

[4] John Hancock Life required Maxim to complete a weekly note describing the particular services Maxim's nurse provided to Carr, and the nurse and Carr reviewed and signed each note. (*See, e.g.*, Doc. 34-4 at 52) For instance, if the nurse assisted Carr by emptying Carr's catheter bag and by cleaning Carr's kitchen, the nurse marked the weekly note's boxes entitled "empty catheter bag" and "clean kitchen." (*See* Doc. 34-4 at 52)

[5] The Univita nurse noted Carr's improving functional ability. For instance, a report from the February 2013 assessment observes that, although Carr struggled with his balance, Carr had gained strength and could use a walker. (Doc. 69-1 at 46–48)

[6] In mid-June 2013, the nurse assisting Carr stopped working for Maxim and began submitting to John Hancock Life an "independent care provider service bill," which summarizes the

the nurse assisted Carr neither with bathing nor with any other activity of daily living. (Doc. 34-4 at 53–68)  As a result, in July 2013, John Hancock ordered another assessment by Univita. (Doc. 34-2 at 11; Doc. 69-1 at 60–78)  Like the cognitive screening completed in February 2013, the July 2013 cognitive screening revealed no evidence of a cognitive impairment. (Doc. 69-1 at 63–66)  Further, the evaluation of Carr's functional ability confirmed that Carr required no assistance with any activity of daily living. (Doc. 69-1 at 67–73, 75)

### 3. Claim Denial

Because the weekly notes, the provider bills, and the July 2013 assessment showed that in July 2013 Carr no longer needed assistance, John Hancock Life denied Carr's claim.[7] (Doc. 34-3 at 24)  After John Hancock Life explained that Carr could "submit any additional information [to] help clarify matters" (Doc. 34-3 at 25), Carr requested reconsideration and sent to John Hancock Life medical records purportedly supporting Carr's claim. (Doc. 34-3 at 26–27, 29–30)  After reviewing the medical records, in January 2014 John Hancock Life upheld the denial of Carr's claim. (Doc. 34-3 at 28–30)  Carr twice appealed to John Hancock Life's appeals committee and submitted new records to support his claim. (*See* Doc. 34-3 at 31, 43)

---

nurse's weekly activity and verifies whether the nurse assisted Carr with an activity of daily living. (*See, e.g.*, Doc. 34-4 at 53) After reviewing a provider bill, both Carr and the nurse signed the bill certifying "that the information provided [in the bill] is a complete and accurate representation of the care provided and received." (*See, e.g.*, Doc. 34-4 at 54)

[7] An August 2013 letter states that the denial was "effective July 18, 2013." (Doc. 34-3 at 24)

The new records included a May 2014 statement by a neurologist and an August 2014 statement by a urologist certifying that Carr is a "chronically disabled individual." (*See* Doc. 34-3 at 41–42, 43; Doc. 69-3 at 2)  After reviewing the administrative record, including the new records, the appeals committee upheld John Hancock Life's decision.[8]  (Doc. 34-3 at 40–43)

## DISCUSSION

After exhausting his administrative appeals, Carr sues (Doc. 5) John Hancock Life for wrongfully denying Carr's claim for long-term disability benefits.  Moving (Doc. 30) for summary judgment, John Hancock Life argues that the decision to deny Carr's claim was correct.

## 1. Standard of Review

"ERISA itself provides no standard" for reviewing a benefits decision by a plan administrator.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).  Accordingly, based on guidance from *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), and from *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), the Eleventh Circuit established a "multi-step framework" for reviewing an administrator's benefits decision:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court

---

[8] The appeals committee denied Carr's first appeal in June 2014 and Carr's second appeal in October 2014. (Doc. 34-3 at 40–43)

disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)).  The review of the administrator's benefits decision considers only "the material available to the administrator at the time" of the administrator's decision.  *Blankenship*, 644 F.3d at 1354.

## 2. De Novo Review

A review of the administrative record reveals that John Hancock Life correctly denied Carr's claim.  First, no document in the administrative record suggests, and Carr fails to argue, that in July 2013 Carr qualified for benefits under the policy's cognitive-impairment provision.  (*See* Doc. 30-5 at 9, 14)  Screenings in February 2013 and in July 2013 uncovered no evidence of a cognitive impairment.

(Doc. 69-1 at 39–41, 63–66)  Although a psychiatric evaluation in 2011 notes that Carr was "diagnosed in the past" with Lewy body dementia (Doc. 69-1 at 98), no other document in the administrative record, including notes from Carr's neurologist, corroborates this purported diagnosis or describes any treatment of Carr for dementia or another cognitive impairment.

Second, John Hancock correctly denied Carr's claim because Carr failed to prove that in July 2013 Carr qualified for benefits under the functional-disability provision.  Carr incorrectly argues that John Hancock Life failed to show "that any of [Carr's] medical problems resolved to the extent that [Carr] became fully independent" in the activities of daily living.  (Doc. 36 at 18)  Carr ignores that Carr "bears the burden to prove that [he] is disabled."  *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008).  (Doc. 30-5 at 19 (stating that under the policy Carr must submit a "proof of claim" that is "satisfactory" to John Hancock Life and that confirms that Carr continues "to meet all eligibility requirements")  Thus, Carr must prove that, without either hands-on assistance or standby assistance, Carr could not perform at least two activities of daily living.  (*See* Doc. 30-5 at 8, 9, 14, 19)  Carr failed to meet his burden.

During the February 2013 assessment, an evaluation of Carr's functional ability demonstrated that Carr required assistance with bathing, continence care, toileting, and transferring.  However, Carr's functional ability improved, and during the July 2013 assessment Carr performed without assistance all six activities of daily

living.  (Doc. 69-1 at 67–73, 75)  The nurse who assessed Carr observed that, at a

slow pace, Carr could walk with a "steady gait" and an "erect posture," and Carr

admitted that he was "very pleased with his gains made recently with gait stability

[and] balance."  (Doc. 69-1 at 68, 75)  Carr argues that John Hancock Life failed to

consider Carr's comments about "his continued need for assistance" (Doc. 36 at 19),

but Carr ignores that at the assessment Carr explained to the Univita nurse that he

routinely ate, bathed, defecated, dressed, transferred, and urinated without

assistance.  (Doc. 69-1 at 67–73)

  The weekly notes and provider bills confirm that by July 2013 Carr no longer

met the functional-disability provision's requirements for eligibility.  The weekly

notes, signed by Carr and his nurse, show that from May to mid-June 2013 Carr

received assistance only with a single activity of daily living — bathing.

(*See* Doc. 35-2 at 264, 267, 275)  And the provider bills, which Carr and his nurse

signed and certified, show that from mid-June 2013 to mid-August 2013 the nurse

assisted Carr with no activity of daily living.  (Doc. 34-4 at 53–68)  Carr alleges that

the weekly notes and the provider bills were "deficient" and argues that John

Hancock Life allowed Carr no opportunity to "amend the paperwork."  (Doc. 36

at 20)  This argument fails because John Hancock Life denied Carr's second appeal

more than fourteen months after initially denying Carr's claim, and during those

fourteen months John Hancock Life encouraged Carr to "submit any additional

information that you feel may help clarify matters." (Doc. 34-3 at 25)  Despite ample opportunity, Carr failed to correct the purported deficiency.

The other documents in the administrative record fail to undermine John Hancock Life's conclusion that in July 2013 Carr no longer remained functionally disabled.  A May 2014 statement from Carr's neurologist certifies that Carr lacked ability to perform five activities of daily living.  (Doc. 69-3 at 2)  However, the neurologist's certification is inconsistent not only with the July 2013 assessment, the weekly notes, and the provider bills, but also with the neurologist's own notes.  In a section of the neurologist's April 2014 notes entitled "functional status assessment," the neurologist observes that Carr "can eat, bathe, use the toilet, dress, and get up from the chair or bed." (Doc. 69-5 at 151)  Thus, John Hancock Life correctly assigned little weight to the neurologist's certification.  *See Blankenship*, 644 F.3d at 1356 (holding that a plan administrator "may give different weight" to a treating physician's opinion especially if evidence in the record "could have led [the administrator], with reason, to doubt" the opinion); *cf. Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 Fed. Appx. 971, 977 (11th Cir. 2008) (per curiam) ("To the extent other evidence in the record suggests that a claimant is disabled, a plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability.").

Also, the "relevant time for assessment of [Carr's] condition" is July 2013, the effective date of the denial of Carr's claim. *Ramdeen v. Prudential Ins. Co. of Am.*,

163 F. Supp. 3d 1218, 1225 (M.D. Fla. 2016) (Antoon II, J.).  The neurologist's

statement in May 2014, a similar statement from a urologist in August 2014, and the

medical records from 2012 and earlier fail to rebut the other evidence demonstrating

that in July 2013 Carr needed no assistance with any activity of daily living.[9]

### CONCLUSION

Because a review of the administrative record reveals that John Hancock Life

correctly denied Carr's claim,  John Hancock Life's motion (Doc. 30) for summary

judgment is **GRANTED**.  *See Nolley v. Bellsouth Long Term Disability Plan For*

*Non-Salaried Employees*, 610 Fed. Appx. 841, 843 (11th Cir. 2015) (per curiam) ("If we

would have reached the same decision as the administrator, the judicial inquiry ends,

and judgment in favor of the administrator is appropriate.").  The clerk is directed

(1) to enter judgment for John Hancock Life and against Carr, (2) to terminate any

pending motion, and (3) to close the case.

ORDERED in Tampa, Florida, on October 17, 2016.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

---

[9] Many if not most of the medical records submitted by Carr are irrelevant because the
records fail to discuss Carr's functional ability. (*See, e.g.*, Doc. 69-3 at 17–20)